KING, Justice,
dissenting.
¶ 23. I dissent from the plurality opinion herein.
¶ 24. In the trial court, this products liability case resulted in a jury verdict in favor of the plaintiffs. The trial court then granted the defendants’ motion for judgment notwithstanding the verdict (JNOV), holding that the plaintiffs’ proof failed to meet the frequency, regularity, and prox *74 imity test. The plaintiffs have appealed the grant of that JNOV to this Court.
¶25. The plurality holds that the frequency, regularity, and proximity test is restricted to a determination of whether to grant or deny summary judgment. PI. Op. at 8-14. The plurality decides that the trial court applied an incorrect standard to grant the defendants’ motion for JNOV, thus it should reverse and remand this matter “for further proceedings consistent with our opinion.” PI. Op. at 15.
¶ 26. The plaintiffs raise only one issue in this appeal, which is that: “The trial court erred by granting Appellees’ motion for judgment notwithstanding the verdict because more than sufficient evidence supported the jury’s verdict.” There is no cross-appeal by the defendants and, thus, no additional issue has been placed before this Court by the defendants. Therefore, the sole issue before this Court is whether the plaintiffs submitted to the jury sufficient evidence upon which reasonable persons might return a verdict for the plaintiffs. See Architex Ass’n, Inc. v. Scottsdale Ins. Co., 27 So.3d 1148, 1154 (¶ 13) n. 11 (Miss.2010) (finding issue not properly before Court because appel-lee failed to file a cross-appeal). The Court repeatedly has held that it will not address issues not raised on appeal. See Hood ex rel. State Tobacco Litigation, 958 So.2d 790, 815 (¶86) n. 17 (Miss.2007). The plurality completely ignores the issue placed before it by the plaintiffs and the Court’s admonition that it will not address issues not raised on appeal.
¶27. The question presented to this Court is whether there was sufficient evidence to support the jury’s verdict. The plurality would reverse this matter for consideration under Mississippi Code Section 11-1-63 (Rev.2002), the Products Liability Statute. The plurality, however, fails to indicate which element, if any, of the products liability statute was not placed before the jury. A review of the record indicates that sufficient evidence was placed before the jury from which it could be found that the plaintiffs established a products liability claim pursuant to Section 11-1-63. Because I believe that there was sufficient evidence from which the jury could return a verdict in favor of the plaintiffs, I dissent and would reverse the grant of JNOV and reinstate the jury’s verdict as rendered for the plaintiffs.
¶ 28. Howard Case testified that he worked in the oil drilling industry with Larry Smith off and on from 1966 through 1990. During that time, Larry mixed drilling mud, which contained asbestos. This was a very dusty process, which placed a significant amount of asbestos dust in the air, and no respirators were used. Case worked with Larry at Barnwell, where Larry was exposed to Flosal, an asbestos product. He worked with Larry at Reading and Bates, where Larry also was exposed to Flosal. He worked with Larry at Big Chief, where Larry was exposed to Super Visbestos, Visbestos, and Flosal, all of which were asbestos products. They worked at Helmerich & Payne in 1973 and 1974, where Larry was exposed to Flosal, SuperVisbestos, and Visbestos, all of which were asbestos products. They worked for Delta Drilling, from about 1974 to 1988, where Larry was exposed to Visquick, an asbestos product. Additionally, Larry was exposed to Shurlift, an asbestos product, but he did not recall at which company.
¶ 29. Jack Graves testified that he had worked with Larry for three months, on Delta Rig 56, where Larry was exposed to Visbestos, Shurlift, Super Best, Flosal, and Visquick, all asbestos products. The workers were not provided with respirators or protective clothing. They worked seven days a week and were on call twenty-four hours a day.
*75 ¶ 30. Denver Anding worked with Larry in the late 1960s at Marlin Drilling Company for a period of four months. Larry was exposed to Flosal, an asbestos product, and worked without a respirator or protective clothing. Nor were the workers given any warning regarding the danger of asbestos.
¶ 31. Dr. Edwin Holstein, who practiced occupational medicine, testified that Larry suffered from lung cancer due primarily to exposure to asbestos. Larry’s exposure to asbestos concentration was considered substantial. Dr. Holstein opined that the four months Larry worked at Marlin would have been sufficient exposure to asbestos to cause Larry’s lung cancer.
¶ 32. Dr. Murray Finklestein, an epidemiologist, testified that Larry’s lung cancer was caused by exposure to asbestos and smoking. Dr. Colella, a diagnostic radiologist, testified that Larry was exposed to asbestos working in the 1960s, 1970s, and 1980s and that his lungs showed asbestos-related disease. Dr. Kenneth Cohen, an industrial safety engineer and certified industrial hygienist, testified that Larry had significant exposure to asbestos under his working conditions. Dr. Jerrold Abraham, a pathologist, testified that there was no safe type of asbestos and that Larry’s lung cancer was caused by exposure to asbestos.
¶33. Ken Campbell, who served as president of Montello from its beginning in 1957 to the early 1990s, testified that Mon-tello had used asbestos from Union Carbide in its products of Visbestos and Super Visbestos. The process used was that Montello took the orders, Union Carbide did the manufacturing, and, in most cases, it shipped directly to the customer. He stated that Shurlift was Visbestos-pack-aged under EMCO’s private label.
¶ 34. J.C. Floyd, who worked for Phillips 66 starting in 1966 until retirement in 1992, testified that nonasbestos products were available as early as 1956, and that his company was aware at least by 1969 that asbestos was a carcinogen. He testified that, in August 1973, Phillips 66 circulated a memo to Drilling Specialty employees which indicated that any person who handles loose Flosal fiber for a cumulative total of seven hours per year was an asbestos worker and was entitled to an annual company physical. As a result, Floyd took a medical exam for asbestos exposure, but he did not tell persons who worked daily with asbestos in the oil field about the availability of this medical exam.
¶ 35. Floyd testified that Drilling Specialties put Flosal on the market in 1964, using asbestos from Johns Mansville. He testified that Flosal was packaged under a private label for EMCO, that it was placed in an IMCO bag with the IMCO label.[6] Super Best was a Montello/Union Carbide product. Shurlift was a Phillips 66/Drill-ing Specialties product packed for IMCO.
¶ 36. Floyd testified that after 1965, Drilling Specialties and Montello were the only suppliers of asbestos for drilling mud. He testified that Drilling Specialties also packaged Flosal under a private label of Magcober Visquick, for Magcobar/Dresser Industries.
¶ 37. Phillips 66 admitted that, from 1964 through 1985, nonasbestos products were available for use in oil drilling. It admitted that Flosal was intended to perform its function without causing asbestos-related disease. It admitted that, between *76 1963 and 1967, Flosal was distributed without a warning label. It admitted that the asbestos used in Flosal came from Johns Manville mines from 1964 through 1984.
¶ 38. In response to interrogatories, Phillips stated that IMCO Best and Shur-lift were Flosal, rebranded for International Minerals Company, and Yisquick was Flosal, rebranded for Magcober.
¶ 39. Montello admitted that, prior to 1968, its products contained no warning labels. It admitted that after 1969, the asbestos in all of its products was from Union Carbide. It admitted that all of its asbestos products were intended to perform their function without causing asbestos-related diseases.
¶ 40. Union Carbide admitted in the asbestos toxicology report, which it prepared in 1964, that the potential association between asbestos exposure and certain diseases had been known for years.
¶ 41. Based on the foregoing, sufficient evidence was placed before the jury to establish a products liability claim under Section 11-1-63. The evidence presented to the jury supported a finding that:
• The defendants were manufacturers and sellers of asbestos products sold for use in the oil-drilling industry.
• The asbestos products manufactured and sold by the defendants were intended to be used in the oil-drilling industry without causing asbestos-related diseases.
• The defendants were aware that there was a link between exposure to the asbestos products they manufactured and sold for use in the oil-drilling inL dustry and several respiratory diseases, including asbestosis and lung cancer.
• While aware of the link between their asbestos products and respiratory diseases, the defendants sold these products for several years without warning of the health hazards.
• Larry Smith was exposed to asbestos products manufactured and sold by the defendants for use in the oil-drilling industry, which were used in the manner intended by the defendants.
• Larry Smith died from lung cancer, which was caused by exposure to asbestos products manufactured and sold by the defendants for use in the oil-drilling industry.
• There was no safe asbestos, and the products manufactured and sold by the defendants for use in the oil-drilling industry were inherently unsafe.
• Alternative, effective, safe, and asbestos-free drilling products were available well before the defendants manufactured and sold their asbestos drilling products for use in the oil-drilling industry.
¶ 42. Based on the testimony, sufficient evidence was presented at trial for a reasonable juror to conclude that the defendants’ products caused Larry’s injury. Accordingly, the jury returned a verdict for the plaintiffs. Therefore, I would reverse the grant of a JNOV, and reinstate the jury’s verdict in favor of the plaintiffs.
KITCHENS AND CHANDLER, JJ., JOIN THIS OPINION.

. The court reporter was inconsistent in spelling the company’s name, thus the two spellings: EMCO or IMCO.